UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE and JOHN DOE,<br><br>Plaintiffs,<br><br>vs.<br><br>NEW YORK FERTILITY INSTITUTE; KHALID SULTAN; MAJID FATEH; MICHAEL FEMI OBASAJU; and DOES 1 THROUGH 10, inclusive,<br><br>Defendants. | Civil Action No.:<br><br><br>COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Jane Doe and John Doe (collectively, "Plaintiffs"),[*] by and through the undersigned counsel, Peiffer Wolf Carr Kane Conway and Wise, LLP, by way of Complaint against defendants New York Fertility Institute, Khalid M. Sultan, Majid Fateh, and Michael Femi Obasaju (collectively, "Defendants"), hereby say, state, and aver as follows:

### NATURE OF ACTION

1.      Defendants, a fertility clinic and its employees, committed three unimaginable—and wholly preventable—errors. **First,** Defendants transferred a stranger's embryo into their patient, Ms. Doe, that was not biologically related to her, thereby impregnating her with a stranger's embryo. Defendants then consistently denied to Plaintiffs that a mistake had been made. **Second,** Defendants lost Ms. Doe's own biological embryo(s) and then refused to inform Ms. Doe and her husband of the whereabouts of their lost embryo(s), whether their embryo may have been implanted into a stranger, and whether they may have a biological child being raised by strangers. **Third,** Defendants affirmatively concealed from the Plaintiffs and the public that Defendant Obasaju has a history of mistakenly implanting a stranger's embryo into the wrong patient—*i.e.*, the same horrific error that happened in this case—as well as a history of knowingly concealing the truth about his wrongful implantation mistakes

---

[*]      Concurrently with the filing of this Complaint, Plaintiffs respectfully seek permission to proceed pseudonymously due to the private and sensitive nature of this case.

from his patients. Each of these errors have caused Mr. and Ms. Doe incomprehensible physical and emotional pain and suffering and, ultimately, when the errors were discovered, led to a termination of Ms. Doe's pregnancy.

2.      The Plaintiffs never would have trusted the Defendants if they had known the truth about Defendant Obasaju's past. Instead, Mr. and Ms. Doe became patients of Defendants and entrusted them with their dreams of having a baby, as well as safeguarding with their most sensitive and important property—their embryos.

3.      Defendants violated that trust. During an in vitro fertilization ("IVF") procedure, Defendants purportedly transferred the Does' biological embryo to Ms. Doe, who consequently became pregnant with a baby girl. Several months into the pregnancy, however, genetic testing indicated the child she was carrying was not biologically related to her. After informing the Defendants of these test results, the Defendants repeatedly insisted the embryo was biologically related to the Does and denied that Defendants made any mistake.

4.      Defendants forced Ms. Doe to become an unwilling and unknowing surrogate for an unknown couple while losing Mr. and Ms. Doe's own embryo(s). To this day, the Does are not certain what became of their own embryo(s).

5.      Upon being alerted to the results of the DNA test, the Defendants engaged in a pattern of denial and concealment, which ultimately led Ms. Doe to a termination of the pregnancy, given that the Does could have lost the baby in court to her genetic parents, or at best, lived in fear of losing their baby to the genetic parents when they became aware of the situation.

6.      Shockingly, the Does recently learned that *this is not the first time the Defendants have made such errors*. Indeed, the Defendants have a history of mixing up, mislabeling, and/or outright losing their patients' genetic material.

## PARTIES

7.      Plaintiffs are individuals who are now, and at all relevant times mentioned in this Complaint were, citizens of Massachusetts.

8.      At all times relevant herein, Defendant NEW YORK FERTILITY INSTITUTE ("NYFI") was and is an entity, organized and existing under the laws of the State of New York, with its principal place of business located at 1016 Fifth Avenue, New York, NY 10028. NYFI was and is in the business

of providing various fertility-related services to the public.

9.      Defendant KHALID M. SULTAN ("Sultan") is a duly licensed, practicing fertility specialist in the State of New York, with an office located at 1016 Fifth Avenue, New York, NY 10028. Sultan is the director of IVF at NYFI.

10.     Defendant MAJID FATEH ("Fateh") is a duly licensed, practicing fertility specialist in the State of New York, with an office located at 1016 Fifth Avenue, New York, NY 10028. Fateh is the medical director and founder of NYFI.

11.     Defendant MICHAEL FEMI OBASAJU ("Obasaju") is a practicing embryologist in the State of New York, with an office located at 1016 Fifth Avenue, New York, NY 10028. Obasaju is the Director of IVF & Andrology & Hormones Laboratories at NYFI.

12.     The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants sued herein as DOES 1 thought 10, inclusive, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names.  Plaintiffs are informed and believe, and thereon allege, that each of said fictitious Defendants caused injury and damages to Plaintiffs.

13.     At all times relevant herein, the Defendants, and each of them, were the agents, servants, partners, aider and abettors, conspirators, employees, and joint venturers of each other. At all times relevant herein, each and all of the Defendants were operating and acting within the course and scope of their respective agency, service, employment, partnership, conspiracy, and joint venture relationships, and rendered substantial assistance and encouragement to each of the other Defendants, knowing that their conduct constituted a breach of duty to each of the Plaintiffs.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) (diversity). Plaintiffs are citizens of a different state from all Defendants, and the amount in controversy, exclusive of fees and costs, greatly exceeds $75,000.00.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b).

## STATEMENT OF FACTS

### New York Fertility Institute (NYFI)

16.     Ms. Doe and Mr. Doe met in 2010 with the goal of raising a family of four children.

17.     After having three children, Plaintiffs consulted with fertility specialists in an attempt to

have their fourth child.

18.     Before proceeding with NYFI, the Does reviewed NYFI's website and spoke with Fateh. They relied upon the representations set forth therein regarding Sultan, Fateh, and Obasaju; NYFI's purportedly high standards of care, treatment, and technology; and its reportedly high success rates. NYFI's website touts NYFI's team as "world-class leaders in fertility care for more than 30 years," who "treat patients like family," "create in-depth, personalized treatment plans," and "have been voted Top Doctors In New York and the Best Family Doctors in America multiple times over." NYFI further boasts that it "has the experience and advanced technology to suit every patient's unique goals."

19.     NYFI's website describes Sultan as "a trusted physician with more than 30 years of professional experience" who "takes a compassionate and holistic approach to medicine, ensuring that his patients feel heard, understood, and comfortable in his care." It further describes Fateh as "a highly skilled physician" who "takes the time to listen to his patients' fertility concerns and treatment goals" and also "performs several services in-office, including genetic testing."

20.     The website also contains a lengthy biography of Obasaju, though it actively conceals and omits crucial portions of his work history where he committed the same unconscionable error that occurred here and that, if disclosed, would have led the Does not to utilize NYFI.

21.     On its "Meet the Doctors" page, Dr. Fateh is featured in a video where he states, "It is important for a patient to have faith and trust in you."

22.     Similarly, Dr. Sultan states in his video: "I'm actually affecting somebody.  It's not just a matter of doing it for the sake of doing it.  I'm doing it – and you're making an impression and a difference in someone's life.  It's important."

23.     Ms. Doe and Mr. Doe had their initial phone consultation with Fateh on April 28, 2020. He emphasized the purported expertise of his team, noted that NYFI is "not a factory" and does not have very many patients, and stated that "he would oversee every aspect of the process for them." This was important to Ms. Doe and Mr. Doe, as they wanted a clinic where the doctors were reachable, responsive and reassuring of their high standards of professionalism and medical care.

24.     Through every step of the process, both orally and in writing, Ms. Doe and Mr. Doe clearly and unequivocally communicated their instruction for Defendants to retrieve Ms. Doe's eggs and fertilize them with Mr. Doe's sperm, and then later to have their resulting embryo(s) transferred to Ms. Doe. At

no point did Defendants disclose a risk that they might fail to keep any of Ms. Doe and Mr. Doe's embryos properly and correctly labeled, or that they might misplace such embryos. Nor did any Defendant disclose to Ms. Doe and Mr. Doe that Defendants might place someone else's embryo into Ms. Doe's uterus without her consent.

**The IVF Services**

25.     IVF is an expensive, invasive and emotional process. The first step for IVF involves several weeks of drug therapy designed to hyper-stimulate the woman's reproductive system into producing multiple eggs as part of her monthly cycle. These eggs are retrieved surgically and then fertilized with sperm in a laboratory. The resulting embryos can be frozen for later use. To prepare for each one of the retrieval procedures, Ms. Doe and Mr. Doe attended many appointments over the course of several months. During these visits, Ms. Doe underwent numerous ultrasounds and blood tests.

26.     To increase the chance for success, Ms. Doe was prescribed drugs to stimulate egg development and ovulation. The drugs were administered daily by needle injections and oral medications for over five weeks, thereby stimulating the ovaries to increase production from the usual one egg to perhaps twenty eggs per month. During this nearly four-month time period of an intensive drug regimen, NYFI coordinated with a local Massachusetts hospital where Ms. Doe went three times per week for ultrasounds and blood tests.

27.     The physical and emotional side effects of this hormone treatment were significant. Ms. Doe and Mr. Doe gave Ms. Doe up to three different needle injections per day. The shots were painful and caused unnatural stomach bloating, red swollen areas around the waist, chronic headaches and sharp mood swings. Ms. Doe felt like she was on an emotional rollercoaster during this time.

28.     During each egg-retrieval surgery, eggs were extracted from Ms. Doe. Following each retrieval procedure, Ms. Doe experienced acute pain and achiness. She could not get out of bed for several days.

29.     Ms. Doe ultimately had three egg retrievals performed under NYFI's care, in October 2020, January 2021, and April 2021.

30.     Prior to each egg retrieval, Ms. Doe and Mr. Doe filled out a lengthy consent form, specifying that each mature egg retrieved from Ms. Doe should be fertilized by NYFI using Intracytoplasmic Sperm Injection ("ICSI") with Mr. Doe's sperm, that all blastocysts should be genetically

tested and that NYFI's embryologist should use assisted hatching techniques. They also authorized NYFI to discard all embryos not reported as chromosomally normal. One example of these contracts is attached as Exhibit A.

31.     Ms. Doe and Mr. Doe also instructed NYFI's embryologist, Obasaju, to take small biopsies from all of their embryos to send to Invitae, an external testing company, for Preimplantation Genetic Testing ("PGS"). PGS is commonly used during IVF to screen out embryos with genetic abnormalities that are likely to cause birth defects or miscarriage. Only the biopsied cells were to be sent to the external testing lab, while the embryos themselves were to remain under the Defendants' custody and care.

32.     On information and belief, following each egg retrieval, Obasaju fertilized the retrieved eggs with Mr. Doe's sperm in NYFI's in-house laboratory per Ms. Doe and Mr. Doe's instructions, and subsequently monitored the development of the fertilized eggs into embryos. Obasaju then took biopsies from the embryos for PGS testing and cryo-preserved the embryos for later use.

33.     The Invitae PGS results for the six embryos retrieved in October 2020 were indeterminate, meaning it was unclear whether they were chromosomally normal.

34.     The January 2021 cycle produced four embryos. The PGS results for this cycle were as follows: one normal embryo (#1), two chromosomally abnormal and unusable embryos (#2, #4), and one indeterminate result (#3).

35.     The April 2021 retrieval cycle did not result in any surviving embryos. Ms. Doe and Mr. Doe were particularly relieved that the one normal embryo from their January 2021 cycle was female.

36.     In November 2020, Sultan convinced Ms. Doe and Mr. Doe to use one of the indeterminate embryos from the October 2020 retrieval cycle in a transfer procedure. Prior to the transfer, Ms. Doe and Mr. Doe had to fill out a consent form that expressly stated they "consented to attempt to become pregnant using our cryopreserved embryos" to be transferred to Ms. Doe. Unfortunately, the transfer was unsuccessful.

37.     On July 7, 2021, Ms. Doe had another embryo transfer procedure at NYFI, performed by Sultan. Ms. Doe and Mr. Doe specified that Sultan use the normal, female embryo from their January 2021 retrieval cycle. Again, prior to the transfer, the couple filled out an embryo Thaw and Transfer Informed Consent Form that explicitly specified that Ms. Doe and Mr. Doe intended to use "our" embryos, to be transferred to Ms. Doe. (*See* June 22, 2021 Embryo Thaw and Transfer Informed Consent Form,

emphasis added, attached as Exhibit B.)

38.     As the Does later learned, however, their embryo was not actually transferred to Ms. Doe that day. Unbeknownst to them at the time, the embryo that Sultan transferred into Ms. Doe's uterus belonged to a stranger.

39.     To this day, the Does neither know whose embryo was transferred into Ms. Doe's uterus, nor the location of the embryo that NYFI was supposed to transfer to Ms. Doe on July 7, 2021. They have been terrified that their embryo(s) was transferred to yet another couple by NYFI, and their child is being raised by strangers. Exacerbating the Does' distress, the Defendants repeatedly refused to provide the Does, and concealed from the Does, information concerning the whereabouts of their lost embryo(s) and whether the Defendants have impregnated a stranger with the Does' embryo(s).

**The Pregnancy**

40.     Following the July 2021 transfer, in August, Ms. Doe and Mr. Doe were overjoyed to learn that Ms. Doe was pregnant. They spent the next several months preparing for their new baby.

41.     Thrilled with the fact that they were pregnant, the Does shared the news of the pregnancy with their children, extended family and friends. Ms. Doe named the baby after her grandmother and created a space in their home for a nursery. Additionally, both Mr. and Ms. Doe coordinated the logistics of their planned maternity and paternity leaves with their employers.

42.     In the meantime, NYFI informed the Does that the remainder of their frozen embryos would be sent to an offsite, third-party facility for long-term storage.

**Warning Bells and Red Flags**

43.     In August 2021, following her positive pregnancy test, NYFI informed Ms. Doe's OBGYN in Massachusetts that she was pregnant. Ms. Doe ultimately stopped the fertility medications on September 10, 2021.

44.     As part of Ms. Doe's prenatal care, Ms. Doe's OBGYN recommended that Ms. Doe have blood drawn and sent to a lab for a "Panorama" prenatal screening, designed to determine the chance of certain specific chromosomal abnormalities in the fetus.

45.     On September 9, 2021, the results of the Panorama test came back. The result was "No results due to uninformative (suspect nonmatching) maternal/fetal DNA patterns. Possible reasons for uninformative DNA patterns include but are not limited to; egg donor, surrogate pregnancy, bone marrow

transplantation." This result did not make sense, since Ms. Doe was supposed to be carrying her *own* embryo.

46.     After worrying about this strange result for a few days, on or about September 14, 2021, Ms. Doe called NYFI and spoke to Sultan to inform him of the Panorama test result and asked him whether he had ever seen this result before.  He assured her that this was surely "a lab error" and that she "shouldn't be concerned."  But, as Mr. and Ms. Doe continued to worry, they decided to repeat the Panorama prenatal screening a second time to ensure the embryo was healthy and was biologically related to them.

47.     Ms. Doe had the second blood sample for the second Panorama test drawn on October 1, 2021.

48.     On October 13, 2021, the second results of the Panorama test came back. Shockingly, they were identical to the first, i.e., "No results due to uninformative (suspect nonmatching) maternal/fetal DNA patterns. Possible reasons for uninformative DNA patterns include but are not limited to; egg donor, surrogate pregnancy, bone marrow transplantation."

49.     The Does were terrified. Ms. Doe immediately texted Christine Pierre, an NYFI medical assistant regarding her concern about the embryo:

> Hey Christine.  [Ms. Doe] here.  Do you have a sec?  Sorry for inconvenience but can you talk ASAP?  We're having some confusion over here with pregnancy stuff.

50.     When Ms. Pierre failed to answer Ms. Doe's text soon after, Ms. Doe then texted Fateh with her urgent question:

> Hi Dr. Fateh.  [Ms. Doe] here.  I have an urgent question about the embryo transfer that i need an answer to an answer to asap.  Im so sorry to bother you.  Please call me.

51.     Following this text, Fateh called Ms. Doe.  Ms. Doe explained her serious concerns about the non-matching DNA result from the Panorma test.  Instead of addressing Ms. Doe's concerns, Fateh said "call Dr. Sultan."

52.     Ms. Doe then texted Sultan with the same urgent question:

> Hi Dr. Sultan.  Your patient [Ms. Doe] here.  I have an urgent question about the embryo transfer that I need an answer to asap.  Dr. Fateh told me to text you.  Im so sorry to bother you.  Please call me.

53.     Sultan called Ms. Doe. He assured her NYFI did not transfer the wrong embryo, and in fact, "could not have transferred the wrong embryo because [Ms. Doe] was the only implant that entire week."

54.     When Ms. Doe pressed Sultan to send proof of the chain-of-custody for the transferred embryo, he provided the following: 1) a screenshot of a vial that has Ms. Doe's name handwritten on it; 2) a screenshot of an embryo that states Ms. Doe's name [though NYFI mis-spelled her name] and "Embryo #1, XX, 7/7/21"; and 3) a copy of the PGS report from Invitae showing there were four surviving embryos from the January 25, 2021 egg retrieval, numbered 1-4.

55.     Sultan claimed that these documents proved that the embryo transferred to Ms. Doe on July 7, 2021, was biologically related to her and Mr. Doe.  He suggested that "your best bet is to call a genetic counselor at Invitae to get answers."

56.     Mr. and Ms. Doe were doubtful that Invitae could provide answers relevant to whether the embryo implanted by NYFI was biologically theirs because Invitae only had custody of biopsy samples of the embryos, not the embryos themselves. However, upon Sultan's recommendation, Mr. and Ms. Doe called Invitae only to be told that the next available genetic counseling appointment wasn't for several weeks. It wasn't until Mr. and Ms. Doe pressed Sultan that, on October 22, 2021, Sultan sent an email introducing them to someone at Invitae.

57.     Sultan failed to disclose that there was no way to know from the documents provided to Ms. Doe and Mr. Doe whether NYFI's embryologist mixed up the samples sent to Invitae for testing with those from another couple. Nor did he disclose at this time that there might be other explanations involving a mistake at NYFI. Rather, Sultan repeatedly assured Ms. Doe and Mr. Doe that there was nothing to worry about, that this embryo was biologically that of Ms. Doe, and that it was healthy.

**The DNA Test**

58.     On October 19, 2021, Ms. Doe and Mr. Doe met with a genetic counselor at their hospital. They spent an hour reviewing family history and the situation at hand. The geneticist suggested that the Does undergo an amniocentesis, as that was the only definitive way to determine whether this child was, in fact, biologically related to Ms. Doe.

59.     Though they were concerned about the risk of miscarriage from the amniocentesis, Ms. Doe and Mr. Doe needed answers. They agreed to an amniocentesis procedure.

60.     Directly after their meeting with the geneticists, on October 19, 2021, Ms. Doe and Mr. Doe texted Christine Pierre, an employee of NYFI:

> Hi Christine.  Just wondering if we can talk to dr. Sultan or dr. Obasaju. We keep meeting with doctors and genetic counselors who tell us the blood tests are coming back as if we had an egg donor (which we did not)-the dna of fetus is not matching my dna. is there any official way we can confirm the embryo transferred was mine? Sultan sent me pictures but they're not sufficient for doctors to confirm that the baby is mine. Do you have a point person at invitae we could also call? I know this is a lot but we're now 4 months pregnant and keep hearing the same thing from different specialists and need to figure it out.

61.     Sultan called the Does again, and—once more—repeatedly assured them that Ms. Doe was carrying her own child and that they had nothing to worry about. He claimed that the pictures he sent previously prove chain of custody and again urged them to call Invitae.

62.     Kara Caputo, the practice manager and operating room coordinator at NYFI, subsequently texted Ms. Doe to reiterate that "Sultan thinks it's best to speak with a genetic counselor." Ms. Doe responded:

> Thanks.  We will reach out. Just so you know, we literally just met with a genetic counselor and she has no explanation, has never seen this before and the only explanation is that it's not ours.  The only recommendation they could give us was to do an amniocentesis to run a maternity test to confirm it's ours.  That's why I'm pestering your office for documentation that would show the egg that was implanted was mine through some more definite chain of custody (serial number etc).

63.     On October 22, 2021, Ms. Doe and Mr. Doe had a Zoom call with Sultan and Fateh. The Does shared their grave concern that the baby Ms. Doe was carrying was not biologically theirs. Both doctors *adamantly* reaffirmed that the baby *must* be Ms. Doe's because "she was the only transfer that happened at NYFI that week in July." Neither doctor ever mentioned the possibility there had been a mistake.

64.     Later that month, Sultan called the Does and claimed that the non-matching test results must be due to Ms. Doe having an extremely rare condition called "mosaicism" (*i.e.*, two forms of DNA in her body). He stated this must be the case because the biopsies at Invitae from the January 2021 retrieval show two different kinds of DNA: the Does' embryos 1 and 2 matched each other, but did not match embryos 3 and 4. Rather than make the logical conclusion that a mistake may have been made, they instead pinned the situation on Ms. Doe allegedly having this rare genetic condition within her own body.

65.     In that same call, Sultan admitted that he had "never heard of [mosaicism] before" and

"even for him – a doctor – this was a complex situation and very hard to understand." Callously, Sultan further stated that "all that matters is that you have a healthy baby" and "this will be an interesting research paper to write."

66.     Sultan again reassured Mr. Doe and Ms. Doe that Ms. Doe was carrying their own biological baby and claimed that he had spoken to the lab director at Invitae. Sultan stated he was having Invitae run tests on Ms. Doe and Mr. Doe's older embryo biopsies, which he believed would confirm his theory that Ms. Doe displayed mosaicism. These tests, however, did not reveal any indication of mosaicism in the older biopsy set.  Remarkably, notwithstanding this result, Sultan and Fateh continued to reassure the Does that they remained confident that this was "most definitely" Ms. Doe's own child and never even mentioned the possibility that they may have erred by implanting the wrong embryo into Ms. Doe.

67.     At a loss for any other options, and quickly coming up on the deadline for a legal termination of the pregnancy, Ms. Doe and Mr. Doe had an amniocentesis procedure on October 25, 2021. The procedure was humiliating, stressful and physically excruciating for Ms. Doe. It involved a doctor carefully inserting a very long needle through Ms. Doe's abdominal wall, puncturing the amniotic sac in the uterus to obtain amniotic fluid. Because of the movement of the baby, the doctor had to perform the amniocentesis *twice* in order to obtain the adequate amount of amniotic fluid necessary for the DNA and genetic tests. A procedure that typically takes five minutes lasted more than half an hour.

68.     Ms. Doe and Mr. Doe had to wait nearly a month before they received results of the DNA tests, all the while suffering the physical and emotional toll of the stress of the situation, including sleepless nights, nightmares, fatigue, stress headaches and uncontrollable crying.

69.     On or around November 8, 2021, Fateh called Ms. Doe to inquire whether she had received the results of the DNA test. Although the DNA results had not yet come back, Fateh again reassured Ms. Doe, and insisted, that this baby was biologically theirs. In response, Ms. Doe said "I hope you're right, Dr. Fateh. I really do."

70.     On November 22, 2021, Ms. Doe and Mr. Doe received the paternity results from the amniocentesis, which confirmed that Mr. Doe was not biologically related to the child Ms. Doe was carrying. **The results stated that there was a 0.00% probability that Mr. Doe was biologically related to the baby.**

71.     The following day, on November 23, 2021, Ms. Doe and Mr. Doe received the maternity report, confirming that Ms. Doe, too, was also not biologically related to the baby.  **The results stated that there was a 0.00% probability that Ms. Doe was biologically related to the child she was carrying.**

72.     Finally, nearly six months after the July 7, 2021 transfer, Ms. Doe and Mr. Doe knew definitively that neither of them were biologically related to the embryo that the Defendants transferred to Ms. Doe.

73.     Plaintiffs did not know how to process this information. They were upset and overwhelmed with panic and confusion. They were devastated.

74.     Ms. Doe and Mr. Doe did not know what to do. They had grown to love this baby, who had already begun kicking. On the one hand, they did not want to lose her even if she was not genetically related to them. On the other hand, they could not imagine carrying a stranger's baby to term, only to potentially lose her in later legal battles to her biological parents, which would be devastating to the entire family. Additionally, the Does were also haunted by the idea that the Defendants lost one or more of their embryos. Ultimately, Ms. Doe and Mr. Doe contacted an attorney who reached out to NYFI and Fateh to try and get answers.

75.     The next week – during the Thanksgiving holiday – was a non-stop nightmare for Ms. Doe and Mr. Doe. At a time when they should have been chronicling Ms. Doe's pregnancy and enjoying Thanksgiving, they instead were spending long days and sleepless nights talking to lawyers and doctors.

**Defendants Abandon the Does**

76.     Even after knowing they made a grave mistake, and knowing that the Does had a short timeline to decide whether to legally terminate their pregnancy, the Defendants still stonewalled, refused to provide facts, and concealed information that the Does requested. By this time, the Does had retained an independent embryologist to try to help figure out whose embryo was inserted into Ms. Doe and where the Does' missing embryo resided. The embryologist sought to have a meeting with Obasaju before the fast-approaching deadline for termination of the pregnancy, but NYFI would not let Obasaju meet with the Does' embryologist. This, despite the fact that Obasaju was in the laboratory on the days that the independent embryologist asked to meet with him.

77.     Moreover, the Does' embryologist asked Sultan for specific documents and information

that would assist her time-sensitive analysis. NYFI provided the embryologist with the Does' patient files, but virtually none of the other documents she requested. When the Does' counsel asked Sultan why he did not provide the remaining documents, he at first lied, and claimed he had provided all documents that were requested. When pressed, he later admitted that he had lied and did not provide the requested information. In the end, NYFI refused to provide the documents before the Does had to decide whether to terminate the pregnancy. To this day, Defendants have refused to provide all of the information requested by the Does' independent embryologist.

78.    While NYFI was concealing the crucial information, Ms. Doe's pregnancy was progressing. At this point, Ms. Doe was near the end of her second trimester. Her OBGYN advised her that *she had only days* to decide whether to terminate the pregnancy, as he could not perform such a procedure during the third trimester.

79.    Ultimately, Ms. Doe and Mr. Doe had to make the most traumatic decision of their lives. On December 1, 2021, Ms. Doe terminated the pregnancy.

80.    Immediately after the termination, Ms. Doe experienced sharp uterine pains and achiness in addition to a large amount of bleeding. For four weeks after the surgery, Ms. Doe lactated profusely. Her breasts were so leaky and swollen that she could not leave the house or sleep through the night. When she did sleep, she experienced nightmares. She was forced to painstakingly wait while her milk subsided. Ms. Doe also experienced phantom kicking for several weeks after the termination.

**History of Errors**

81.    On information and belief, this is not the first time that Obasaju has made a horrific mistake or intentional omission that has resulted in a woman becoming pregnant with a stranger's child. Indeed, he has a history of working with multiple couples' embryos at the same time, leading to disastrous result. The Does only learned of Obasaju's past history while preparing this Complaint for filing.

82.    On information and belief, in 1998, while working as an embryologist at IVF New York, another fertility clinic located in Manhattan, Obasaju loaded two catheters to be used in an IVF transfer procedure with a patient named Donna Fasano. For the first catheter, Obasaju mistakenly used low-quality embryos belonging to a different couple, Deborah Perry-Rogers and Robert Rogers, who were strangers to Ms. Fasano. Obasaju had set the Rogers' embryos aside to be discarded, but then loaded them in a catheter and allowed Lillian Nash, the Reproductive Endocrinologist working on Ms. Fasano's transfer,

to transfer them to Ms. Fasano's uterus. He then provided Nash with another catheter containing Ms. Fasano's embryo(s). Obasaju realized his mistake while the transfer could have been stopped but intentionally decided not to tell Dr. Nash. Indeed, he hid this secret for an entire month, until Ms. Fasano had a positive pregnancy test. Ms. Fasano ultimately gave birth to twins: one child genetically related to herself, and another related to the Rogers family.

83.     This situation prompted a New York Health Department investigation. The ensuing governmental report found that Obasaju knew of his error during the procedure. It furthermore found he could have told Nash and stopped the procedure, so that measures could have been taken to ensure Ms. Fasano did not become pregnant with a child belonging to a stranger.  Instead, he intentionally hid the information and neglected to tell anyone at the time of the procedure, hoping that the embryos would not implant and his mistake would go undiscovered. State officials concluded that Obasaju had not followed the clinic's written operating procedures, and the Health Department report cited Nash for failing to properly supervise Obasaju.

84.     On information and belief, Obasaju's mistake and intentional hiding of the truth ultimately became very public when the Rogers family sued him and IVF New York in March 1999. There was a large feature on the case, on April 17, 1999, in the *New York Times*, titled "Birth Mix-Up Avoidable, Inquiry Finds." The article reports that NY IVF fired Obasaju following this incident.

85.     According to NYFI's website, Obasaju was already working for NYFI as an embryologist at the time of his misconduct at NY IVF and the subsequent public airing of his misdeeds. NYFI knew of this incident at the time and/or or should have learned of it through reasonable due diligence. Furthermore, the Defendants should not have retained Obasaju or, at the very least, should have disclosed this information to NYFI's prospective clients, including the Does.

86.     Obasaju's biography page on the NYFI website makes no mention of his work at NY IVF, intentionally hiding this shameful history from prospective customers of the clinic like Ms. Doe and Mr. Doe. Had NYFI disclosed this to the Does, they would not have used NYFI.

87.     Notwithstanding Obasaju's history of disregarding laboratory protocols, hiding mistakes, and mixing up embryos, NYFI decided to keep Obasaju employed as an embryologist and laboratory director up through at least this year. It further decided not to properly supervise him, which could have prevented the instant tragedy.

88.     On information and belief, this is also not the first time that incorrect embryos have been used for transfer procedures at NYFI, nor the first time that embryos have gone missing. The clinic, Sultan, and Fateh are all defendants in another lawsuit currently pending that alleges the clinic mistakenly transferred a "special circumstances" embryo into a woman's uterus—instead of the healthy embryo that was selected for transfer—and "lost" the healthy embryo for 18 months.

89.     Given the foregoing, each of the Defendants was on ample notice of the risk of mixing up embryos. They also were each aware that the appropriate protocols and procedures either did not exist or were not being used at NYFI; that NYFI intentionally retained a laboratory director with a known history of egregious mistakes and fraudulent omissions relating to the proper care, labeling, and/or separation of embryos; and furthermore that more stringent supervision of the procedures in its own laboratory were needed but sorely lacking.

90.     Each of the Defendants intentionally hid this information from the Does by failing to disclose it both when the Does first sought out fertility services, as well as later when questions about the chain of custody arose regarding the transferred embryo.

91.     In light of the history of such mistakes and intentional omissions, it is even more concerning that Sultan, Fateh, and Obasaju were so adamant and so confident in their repeated, false assertions to Ms. Doe and Mr. Doe that the child Ms. Doe was carrying must be biologically theirs and that any test result stating otherwise must be due to some rare disorder within Ms. Doe's own body (*i.e.*, "mosaicism"). On information and belief, Defendants' repeated and forceful assurances to Plaintiffs were not based on a good-faith belief, but were intentionally designed to give Ms. Doe and Mr. Doe a false sense of security so that they would stop pursuing the truth and the Defendants' mistakes would go unnoticed.

92.     As set forth herein, Sultan, Fateh and Obasaju had multiple chances to engage in open communication with the Ms. Doe and Mr. Doe, disclose their error and provide the information needed to enable the Does to make informed decisions about the baby Ms. Doe was carrying.  Instead, the Defendants intentionally misled Ms. Doe and Mr. Doe to cover up their mistakes.

**Lasting Emotional Impact on Ms. Doe and Mr. Doe**

93.     The impact of Defendants' conduct has been substantial—causing trauma that will affect the Does and their family for the rest of their lives. Ms. Doe and Mr. Doe's pain has not abated. They both suffer from symptoms of anxiety, depression, and Post-Traumatic Stress Disorder every single day. They continue to see mental-health professionals. They no longer trust anyone, including doctors.

94.     Ms. Doe, a typically vibrant woman, continues to weep regularly. She suffers from bouts of anxiety and depression that have impacted her health (insomnia, migraines, weight gain), family life (ability to manage the mental load of mothering) and career (juggling responsibilities and making deadlines).

95.     This experience has also had a profound impact on the Does' marriage. Ms. Doe and Mr. Doe participate in marital counseling to help them process the trauma that has resulted from the physical and emotional invasion they have experienced.

96.     Defendants' misconduct robbed Ms. Doe of the ability to carry her own child. Ms. Doe and Mr. Doe are haunted by questions about what became of their embryos. They have needed to worry about whether their embryos were transferred to another unwitting couple, and whether they have another child or children out in the world whom they have never met?

97.     On top of those fears, Defendants inflicted on Ms. Doe an egregious violation of her body. She is plagued by the knowledge that she unknowingly carried a stranger's baby inside her body. The horror of this situation cannot be understated.

98.     Ms. Doe and Mr. Doe's other children are also devastated. They often become sad about their lost sister, having had written letters and drawn pictures for her. They see Ms. Doe crying and are confused and scared about the entire situation. Mr. and Ms. Doe have been told by their teachers that they bring up the topic while in school.

99.     Ms. Doe and Mr. Doe suffer constant guilt and sadness over the termination of the

pregnancy—a decision they felt they had no choice but to make in order to protect and preserve the well-being of their family. They never consented to the risk of being forced to make such a life-changing, traumatic decision.

100.    Ms. Doe and Mr. Doe have both developed significant physical health problems as a result of Defendants' misconduct. Ms. Doe has experienced insomnia, nightmares, panic attacks, migraines, and uncontrollable bouts of sadness and crying. Mr. Doe has experienced nightmares and stress-induced migraines.

101.    In short, Ms. Doe and Mr. Doe's tragedy has not ended; it is just the beginning of a lifetime of trying to coexist with the pain inflicted on them by the Defendants.

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
**(All Plaintiffs Against Defendant NYFI)**

102.    Plaintiffs incorporate all paragraphs by reference.

103.    Plaintiffs entered into a contract with Defendant NYFI for various IVF services, including but not limited to embryo cryopreservation, storage, and safeguarding, as well as the transfer of frozen embryos created from Plaintiffs' biological material.

104.    There was a meeting of the minds between Plaintiffs and Defendant that the services provided pursuant to this contract would be of the utmost quality and care, in accordance with all recognized standards in the IVF industry.

105.    Terms of this contract were memorialized in writing. *See, e.g.*, Exhibits [TBD]  Any remaining terms were formed orally.

106.    Plaintiffs provided consideration for these services and upheld their end of the bargain by promptly paying all bills.

107.    It was the intent of Plaintiffs and Defendant NYFI that all sides would be held to their end of the bargain, *i.e.*, that the parties had a binding legal contract.

108.    Defendant had a contractual duty to perform all services as agreed upon and as memorialized in records, the parties' agreements, and stated intentions.

109.    Defendant materially breached their obligations by negligently, recklessly, and/or knowingly disregarding Plaintiffs' express instructions by losing track of Plaintiffs' precious and irreplaceable embryo(s), transferring an embryo of unknown origin into Ms. Doe's uterus, by failing to properly and accurately inform Plaintiffs as to the true disposition of their embryo(s), and by causing Ms. Doe to be impregnated with a stranger's embryo.

110.    Defendant furthermore exacerbated the damages caused by these breaches by hiding and failing to disclose the true backgrounds of NYFI, Sultan, Fateh, and Obasaju to Plaintiffs; by failing to fully and timely investigate the discrepancies associated with the transfer; and by failing to fully apprise Plaintiffs of the true situation upon its first notification that there were discrepancies in Plaintiffs' bloodwork.

111.    Due to the highly sensitive nature of the services to be provided under this contract, it was reasonably foreseeable to Defendant NYFI that its breach would result in substantial emotional damages.

112.    As a direct and proximate result of Defendant's breach, the Plaintiffs suffered extreme emotional, property, and economic damages.

113.    Defendant's conduct was a substantial factor in causing Plaintiffs' harm.

## SECOND CAUSE OF ACTION

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (All Plaintiffs Against Defendant NYFI)

114.    Plaintiffs incorporate all paragraphs by reference.

115.    In every contract there is an implied covenant of good faith and fair dealing which encompasses any promise that a reasonable person would be justified in understanding was included in the contract.

116.    Defendant's conduct, including but not limited to Defendant's failure to fully disclose all aspects of its breaches, constitutes a breach of the implied covenant of good faith and fair dealing, which resulted in damages to Plaintiffs.

117.    As a direct and proximate result of Defendant's breach, the Plaintiffs suffered, as extreme emotional, property, and economic damages.

118.    Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

## THIRD CAUSE OF ACTION

## MEDICAL MALPRACTICE

### (All Plaintiffs Against NYFI, Sultan, and Fateh)

119.    Plaintiffs incorporate all paragraphs by reference.

120.    At all relevant times, Defendants and their agents and/or employees undertook to treat, monitor, and care for Plaintiffs and their genetic material.

121.    Defendants, and each of them, had a duty to render the treatment necessary to achieve Plaintiffs' treatment goals using the same level of skill, prudence, and diligence that other members of their profession commonly possess and exercise.

122.    Defendants had a duty to act in a manner consistent with all medical and professional standards governing IVF, including performing the procedures according to the industry standard, obtaining informed consent regarding the procedures as understood and agreed to by the parties, disclosing the risks associated with the procedures, and performing the procedures as agreed upon and memorialized in the parties' agreements.

123.    Defendant NYFI breached its duties by failing to monitor, label, maintain and utilize Ms. Doe and Mr. Doe's genetic material in accordance with their express directives. NYFI further breached its duties by failing to have in place and/or compel compliance with protocols and procedures to ensure that such misuse of Plaintiffs' genetic material could never happen. Similarly, Defendants failed to supervise sufficiently their employees and agents. All of this misconduct fell far below the applicable standard of care for fertility specialists and a purportedly renowned fertility clinic.

124.    NYFI, Sultan and Fateh breached their duties by failing to ensure that these tasks were carried out by their selected employees and agents with the utmost of skill and competence. They further breached their duty by providing incomplete information for Ms. Doe and Mr. Doe to provide informed consent. They further breached their respective duties by failing to ensure that Ms. Doe and Mr. Doe's embryo(s) were properly documented and subject to chain of custody procedures. Defendants also breached this duty by transferring an embryo of unknown origin into Ms. Doe's uterus. Defendants furthermore breached this duty by failing to follow-up with Plaintiffs and fully investigate when Defendants became aware of discrepancies with the transfer. This conduct fell far below the applicable standard of care for fertility specialists and a renowned fertility clinic.

125.    Defendants, jointly and severally, acting by themselves and through their agents and/or employees, failed to use due, reasonable and proper care of Plaintiffs and their genetic materials, and deviated from accepted standards of medical care prevailing in the area of IVF, and Defendants failed to exercise the knowledge, skill and diligence, which as healthcare professionals they should have possessed and exercised on behalf of the Plaintiffs, and were otherwise careless, reckless, and negligent.

126.    More specifically, Defendants failed to properly identify, label, handle, store, cryopreserve, thaw and transfer Plaintiffs' embryos.

127.    Plaintiffs' genetic materials and the resulting embryos remained in the custody, care and control of Defendants at all times.

128.    On July 7, 2021, Defendants, their agents, and/or employees failed to properly transfer the Plaintiffs' own embryos to Plaintiff Jane Doe.

129.    On July 7, 2021, Defendants, their agents, and/or employees, negligently transferred an embryo to Plaintiff Jane Doe which was made up of the genetic materials of unknown individuals.

130.    As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered damages, including but not limited to, loss of embryos belonging to them and the loss of the unborn child carried by Plaintiff Jane Doe.

131.    Plaintiffs' damages would not have occurred but for the negligence of Plaintiffs.

132.    Plaintiffs did not cause or contribute to the Defendants' actions and the resulting damages.

133.    Plaintiffs may rely on the doctrine of res ipsa loquitur in proving their claims.

134.    As a direct and proximate result of Defendants' negligence, the Plaintiffs suffered, as direct victims, extreme emotional, property, and economic damages in an amount to be proven at trial. Moreover, as a direct and proximate result of Defendants' negligence, Jane Doe suffered, as a direct victim, physical damages.

135.    Each of the Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

136.    Plaintiffs are not conceding that their claims are necessarily rooted in medical malpractice. However, they plead this cause of action in the event that the Court determines that these claims sound in medical malpractice more than non-medical negligence.

**FOURTH CAUSE OF ACTION**

**NEGLIGENCE**

**(All Plaintiffs Against all Defendants)**

137.    The Plaintiffs incorporate all paragraphs by reference.

138.    Defendants had a duty to use reasonable care in the storage and care of the Plaintiffs' embryos. Defendants furthermore had a duty to have reasonable policies and procedures, as well as to carry out such policies and procedures, to ensure that their services were competently performed.

139.    Defendants had a duty to act in a manner consistent with community standards governing IVF, including performing the procedures according to the industry standard, obtaining informed consent regarding the procedures as understood and agreed to by the parties, disclosing the risks associated with the procedures, and performing the procedures as agreed upon and memorialized in the parties' agreements.

140.    In breach of this duty, Defendants failed to exercise reasonable care under the circumstances and were negligent.

141.    More specifically, Defendants failed to properly identify, label, handle, store, cryopreserve, thaw and transfer Plaintiffs' embryos. Defendants further had a duty to supervise their employees and agents, but failed to do so.

142.    Defendants furthermore had a duty of care based on the fact that they voluntarily undertook to render cryopreservation and fertility services to the Plaintiffs, and therefore had a duty to perform these services with a reasonable degree of care. Defendants furthermore knew or should have known that failure to exercise such care increased the risk of harm to Plaintiffs. Moreover, to the extent that Defendants' undertaking to store the material constitutes a bailment for hire, which is hereby alleged, Defendants had a duty of care with respect to the bailed property.

143.    Defendants had a basic duty and a duty based on voluntarily undertaking to oversee and render fertility services to the Plaintiffs, and therefore had a duty to perform these services with a reasonable degree of care. These defendants furthermore knew or should have known that failure to exercise such care increased the risk of harm to the Plaintiffs.

144.    The Plaintiffs relied on all of the Defendants' aforementioned duties of care to them in placing their genetic material in Defendants' care.

145.     Defendants breached these duties by negligently, recklessly, and/or knowingly losing track of one or more of Plaintiffs' embryos, and by failing to have in place policies and procedures that would have prevented such negligent, reckless, and/or knowing improper use.

146.     Defendants further breached these duties by negligently, recklessly, and/or knowingly using an embryo of unknown origin in a transfer procedure with Jane Doe, and by failing to have in place policies and procedures that would have prevented such negligent, reckless, and/or knowing improper use.

147.     Defendants furthermore breached their duties by failing to follow-up with Plaintiffs, disclose complete information, and fully investigate when Defendants became aware of discrepancies with the transfers.

148.     As a direct and proximate result of Defendants' negligence, the Plaintiffs suffered, extreme emotional, physical, property, and economic damages.

149.     Plaintiffs' damages would not have occurred but for the negligence of Defendants.

150.     Plaintiffs did not cause or contribute to the Defendants' actions and the resulting damages.

151.     Plaintiffs may rely on the doctrine of res ipsa loquitur in proving their claims.

152.     Plaintiffs are entitled to recover all such damages as a result of Defendants' negligence.

## FIFTH CAUSE OF ACTION

## BAILMENT

### (All Plaintiffs Against all Defendants)

153.     Plaintiffs incorporate all paragraphs by reference.

154.     Ms. Doe and Mr. Doe delivered to Defendants for safekeeping irreplaceable personal property to be safely and securely kept for the benefit of Plaintiffs, and to be redelivered to them upon demand.

155.     Ms. Doe and Mr. Doe agreed to pay, and did pay, substantial sums in exchange for Defendants' promise to safeguard their embryos for the benefit of Ms. Doe and Mr. Doe.

156.     Defendants received embryos from Ms. Doe and Mr. Doe on this condition.

157.     Defendants continue to exercise control over one or more of Plaintiffs' remaining embryos.

158.     Defendants have failed, refused to inform, and concealed from Ms. Doe and Mr. Doe of the whereabouts of the embryos that were switched with Embryos 1 and 2 from the January 2021 retrieval cycle.

159.   Defendants had a duty to exercise care in identifying, maintaining, and protecting Plaintiffs' embryos that were delivered to Defendants. Further, Defendants had a duty to ensure that the Plaintiffs' return the embryos, undamaged, to Ms. Doe and Mr. Doe, to whom the embryos belonged.

160.   Defendants invited the general public, including Plaintiffs, to entrust embryos to Defendants' care by holding out NYFI as a world-class fertility clinic with a top-notch embryology lab.

161.   Because of Defendants' wrongful conduct, the irreplaceable property of Ms. Doe and Mr. Doe was either lost or wrongfully transferred to other clients of NYFI, precluding its redelivery to Plaintiffs as provided for under the bailment contract.

162.   Defendants breached their duty to exercise care in the safekeeping and accurate identification of Plaintiffs' embryos delivered to Defendants and to return the embryos to Ms. Doe and Mr. Doe.

163.   On information and belief, Defendants have failed to properly ensure accurate identification policies and procedures at NYFI, such that Plaintiffs' remaining embryos have not been properly identified and cannot be returned for the benefit of Ms. Doe and Mr. Doe.

164.   Defendants breached their duty to exercise care in the proper identification and segregation of Plaintiffs' embryos from other embryos entrusted to NYFI.

165.   As a direct and proximate result of Defendants' breaches of bailment contract, Ms. Doe and Mr. Doe have been deprived of the opportunity to use the embryos they entrusted to Defendants, and have suffered damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

## CONVERSION

### (All Plaintiffs Against all Defendants)

166.   Plaintiffs incorporate all paragraphs by reference.

167.   Ms. Doe and Mr. Doe owned their genetic material, and the resulting embryos, which were placed in Defendants' care for the express purpose of safekeeping and storage until such a time as Ms. Doe and Mr. Doe directed otherwise.

168.   In 2021, Ms. Doe and Mr. Doe requested their embryo be returned to them by means of a frozen embryo transfer.

169.   Defendants, and each of them, substantially interfered with Ms. Doe and Mr. Doe's

ownership rights over their embryo by knowingly or intentionally failing to institute appropriate procedures and protocols—or failing to abide by such protocols—to ensure that genetic material is appropriately labeled and segregated from the genetic material owned by other clients and/or patients of Defendants.

170.    Defendants also substantially interfered with Ms. Doe and Mr. Doe's embryo by knowingly or intentionally transferring and/or causing to be transferred an embryo of unknown origin to Ms. Doe instead of their embryo as requested and promised, and by withholding Ms. Doe and Mr. Doe's embryo(s), thereby depriving the Plaintiffs of their ownership rights over the embryo(s).

171.    Ms. Doe and Mr. Doe did not consent to this deprivation of their ownership rights.

172.    As a direct and proximate result of Defendants' misconduct, the Plaintiffs suffered severe emotional, physical, property, and economic damages.

173.    Defendants' misconduct was a substantial factor in causing Plaintiffs' harm.

174.    Plaintiffs did not cause or contribute to the Defendants' actions and the resulting damages.

175.    Plaintiffs are entitled to recover all such damages as a result of Defendants' misconduct.

## SEVENTH CAUSE OF ACTION

## FRAUDULENT CONCEALMENT

**(All Plaintiffs Against Defendants NYFI, Sultan, and Fateh)**

176.    Plaintiffs incorporate all paragraphs by reference.

177.    NYFI and Fateh marketed and promoted NYFI's services and made representations to the public and to Plaintiffs Ms. Doe and Mr. Doe regarding the quality of those services as described herein.

178.    Defendants' representations were false and/or meaningfully incomplete, and Defendants either knew the truth or made the representations without regard for the truth. NYFI and Fateh intended for Plaintiffs to rely on their representations and pay them to perform IVF services, and Plaintiffs reasonably relied on these representations when purchasing such services. Moreover, had Plaintiffs been apprised of the deficiencies affecting the relevant systems and protocols, Plaintiffs would not have purchased or continued purchasing such services.

179.    NYFI and Fateh intentionally suppressed and concealed material facts concerning the services being provided, including but not limited to the fact that both NYFI and Obasaju had a history of allegations of mislabeling and mixing up patients' material, and that there were serious questions

regarding whether the correct embryo had been transferred to Ms. Doe. NYFI and Fateh knew or reasonably should have known that NYFI's systems and processes were inadequate to protect against damage to Plaintiffs, and that NYFI's principals, Sultan and Fateh, did not exercise sufficient oversight over Obasaju to protect against such damage. NYFI and Fateh intentionally failed to notify Plaintiffs of these risks and furthermore failed to inform them when questions arose about Ms. Doe and Mr. Doe's own transfer.  The omission and concealment of these facts made NYFI and Fateh's actual disclosures deception regarding FYFI's systems and processes, the risks of the transfer, and the facts of Ms. Doe and Mr. Doe's own transfer.

180.    Plaintiffs had no reasonable means of knowing that NYFI's systems and processes were inadequate, or that NYFI's representations about such systems were incomplete, false, or misleading for failure to disclose such inadequacies. Plaintiffs did not and reasonably could not have discovered NYFI and Fateh's deception prior to purchasing (and continuing to pay for) these services. Moreover, had Plaintiffs been apprised of the true facts, Plaintiffs would have taken different, immediate action—to Defendants' immediate detriment.

181.    Defendants were under a duty to disclose the true facts to Plaintiffs. This duty arose by reason of Defendants' exclusive knowledge regarding the true facts, and because Defendants made partial, erroneous representations about relevant facts without disclosing material facts needed to understand the truth.

182.    Defendants intended to deceive Plaintiffs by concealing the true facts.

183.    Plaintiffs reasonably relied to their detriment upon Defendants' material omissions and misrepresentations. Plaintiffs were unaware of the omitted material facts and would not have acted as they did had these facts been disclosed.

184.    Plaintiffs sustained damage as a direct and proximate result of Defendants' fraud, deceit and fraudulent concealment.

185.    Defendants' deceit and concealment was a substantial factor in causing Plaintiffs' harm.

186.    The foregoing acts and omissions were committed maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights, interests, and well-being to enrich NYFI and Fateh.

## EIGHTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (All Plaintiffs Against NYFI, Sultan and Fateh)

187.    Plaintiffs incorporate all paragraphs by reference.

188.    Defendants negligently transferred, or caused to be transferred, an embryo into Plaintiff Jane Doe that did not contain her genetic material. Defendants also negligently lost one or more embryos belonging to Plaintiffs. By these negligent acts, Defendants caused Plaintiffs to carry and bond with another couple's unborn child.

189.    During Ms. Doe's pregnancy, Plaintiffs inquired of Defendants on multiple occasions about the potential risk that an error occurred during the IVF process.

190.    Defendants repeatedly and adamantly assured Plaintiffs that no mistake had been made. Defendants intentionally concealed from Plaintiffs the possible risks associated with the procedures performed by the Defendants and/or the fact that an error occurred.

191.    Defendants' intentional conduct was extreme and outrageous, and in a manner in which they knew, or should have known, would result in Plaintiffs' severe emotional distress.

192.    Plaintiffs' injuries and damages are the direct and proximate result of the Defendants' conduct.

193.    Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

194.    As a result of Defendants' conduct Plaintiffs have and will continue to suffer severe emotional distress and associated financial damages.

## NINTH CAUSE OF ACTION

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (All Plaintiffs Against all Defendants)

195.    Plaintiffs incorporate all paragraphs by reference.

196.    Defendants negligently transferred, or caused to be transferred, an embryo into Plaintiff Jane Doe that did not contain her genetic material. Defendants also negligently lost one or more embryos belonging to Plaintiffs. By these negligent acts, Defendants caused Plaintiffs to carry and bond with another couple's unborn child.

197.    Defendants' negligent conduct was extreme and outrageous, and in a manner in which they knew, or should have known, would result in Plaintiffs' severe emotional distress.

198.    Plaintiffs' injuries and damages are the direct and proximate result of the Defendants' conduct.

199.    Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

200.    As a result of Defendants' conduct Plaintiffs have and will continue to suffer severe emotional distress and associated financial damages.

## TENTH CAUSE OF ACTION

## BATTERY

### (Plaintiff Jane Doe Against NYFI and Sultan)

201.    Plaintiffs incorporate all paragraphs by reference.

202.    Plaintiff Jane Doe consented to the transfer into her uterus of an embryo comprised of genetic material from the Plaintiffs. She did not consent to the transfer into her body of any other embryos.

203.    Defendants transferred an embryo into Ms. Doe's body that was created from strangers' genetic material, without her consent.

204.    Defendants' conduct in transferring this material to Ms. Doe's body was made with the intent to harm her or with willful disregard for her rights.

205.    Defendants' conduct in connection with this transfer was extreme and outrageous, and in a manner in which they knew, or should have known, would result in Plaintiff's severe emotional distress.

206.    A reasonable person in Plaintiff's situation would have been offended by having an embryo created from strangers' genetic material transferred into her body, without her consent.

207.    As a direct and proximate result, Plaintiff sustained physical, emotional, and financial damages.

## ELEVENTH CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY

### (All Plaintiffs Against Defendants NYFI, Sultan, and Fateh)

208.    Plaintiffs incorporate all paragraphs by reference.

209.     Defendants were in a position of trust and confidence with respect to Plaintiffs' care in order to conceive children utilizing Defendants' IVF services. Plaintiffs knew little or nothing about IVF and, as a result, placed great reliance, faith and confidence in the advice and acts of Defendants.

210.     Defendants had a fiduciary duty to Plaintiffs to collect, store, thaw and transfer Plaintiffs' embryos with the correct identification.

211.     Defendants further had a fiduciary duty to exercise good faith in advising the Plaintiffs on the progress of the fertility services rendered.

212.     Defendants breached the fiduciary duties owed to the Plaintiffs by failing to, among other things, collect, store, thaw and transfer Plaintiffs' embryos with the correct identification.

213.     Defendants further breached their fiduciary duty by failing to act in good faith during the IVF process, including when Plaintiffs communicated with them after the Panorama test results came back.

214.     As a direct and proximate result of the breach of the fiduciary duty, Plaintiffs have incurred substantial damages, including financial losses.

## TWELTH CAUSE OF ACTION

## VIOLATIONS OF CONSUMER PROTECTION FROM DECEPTIVE ACTS & PRACTICES  (NEW YORK GENERAL BUSINESS LAW §§ 349 AND 350 *ET SEQ.*)

### (All Plaintiffs Against Defendant NYFI)

215.     Plaintiffs repeat each allegation set forth above, as if set forth more fully herein.

216.     Sections 349 and 350 of New York's General Business Law protects consumers by prohibiting all deceptive acts and practices, including false advertising, in the conduct of any business, trade or commerce, or in the furnishing of any service in the State.

217.     Defendant's advertising and services are directed towards consumers in that Defendant routinely and regularly advertises its services to residents throughout the United States, including residents living within the State of New York, as well as in other countries.

218.     Defendant's advertising and services were directed towards the Plaintiffs and resulted in Plaintiffs retaining and utilizing Defendants services.

219.     Defendant's corresponding acts and practices violated New York's General Business Law including by:

    a.  Representing that its services, processes, and procedures had characteristics, uses, and benefits they did not have;

    b.  Representing that its services, processes, and procedures were of a particular standard, quality, or grade, when they were not;

    c.  Representing that its services, processes, and procedures had success rates that they did not have; and

    d.  Advertising services with the intent not to sell them and/or render them as advertised.

    e.  Representing the backgrounds of its professional staff in a way that omitted the staff's previous employers and thereby actively concealed serious negligence and errors made by the staff in their previous employment.

220.   Defendant's conduct and activities were deceptive, fraudulent, false and misleading, and thereby constitute violations of  Sections 349 and 350 New York's General Business Law.

221.   Plaintiffs have suffered substantial injuries as a direct result of Defendant's deceptive, fraudulent, false and misleading conduct.

222.   Defendant's conduct has caused, and will continue to cause, irreparable injury to Plaintiffs.

223.   Defendant's conduct as set forth herein was reprehensible and constitutes numerous violations of law, including New York's General Business Law(s), and must be punished in accordance with the full protections offered under New York's General Business Law(s).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief and judgment as follows:

(a)    Compensatory damages;

(b)    Consequential damages;

(c)    Disgorgement of profits;

(d)    Statutory penalties;

(e)    Punitive damages;

(f)    Attorney fees;

(g)    Costs of this action;

(h)    Pre- and post-judgment interest;

(i)    Require Defendants to locate the whereabouts of the Does' embryo(s); and

(j)    Such other additional and further relief that is just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial of all causes of action so triable.


Date: March 25, 2022                    Respectfully submitted,

                                        s/ *Jason J. Kane*
                                        Jason J. Kane
                                        PEIFFER WOLF CARR KANE CONWAY & WISE, LLP
                                        95 Allens Creek Road, Bldg. 1, Ste. 150
                                        Rochester, NY 14618
                                        Telephone: (585) 310-5140
                                        Facsimile: (504) 608-1465
                                        jkane@peifferwolf.com

                                        Adam B. Wolf (*PHV application forthcoming*)
                                        Tracey B. Cowan (*PHV application forthcoming*)
                                        PEIFFER WOLF CARR KANE CONWAY & WISE, LLP
                                        4 Embarcadero Center, Suite 1400
                                        San Francisco, CA  94111
                                        Telephone: (415) 426-5641
                                        Facsimile: (415) 402-0058
                                        awolf@peifferwolf.com
                                        tcowan@peifferwolf.com